IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 9, 2002 Session

# H&R BLOCK  EASTERN TAX SERVICES, INC. v. KAMERON BATES, d/b/a BATES INCOME TAX SERVICE, ET AL.

**A Direct Appeal from the Chancery Court for Overton County**
**No. 26-398     The Honorable Vernon Neal, Chancellor**

---

**No. M2001-02589-COA-R3-CV - Filed September 3, 2002**

---

Plaintiff, provider of a tax preparation service, sued defendants, a tax preparation service and individual former employees of plaintiff, for damages and injunctive relief resulting from procurement of breach of contract by defendant tax preparation service and for breach of non-competition contracts by former employees.  The trial court found that the plaintiff had no right to relief from the defendants and entered judgment for all defendants.  Plaintiff appeals.  We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY KIRBY LILLARD, J., joined.

Gary C. Shockley and Jennifer Gingery Cook, Nashville, For Appellant, H&R Block Eastern Tax Services, Inc.

Daryl A. Colson, Livingston, For Appellees, Kameron Bates, Patricia Bates, Lisa Jo Dunn, and Kellie Bates

Michael Savage, Livingston, For appellee, Janie Perkins

## OPINION

H & R Block Eastern Tax Services, Inc., sued defendants, Kameron Bates, d/b/a Bates Income Tax Service, Patricia A. Bates, Janie Perkins, Lisa Jo Dunn, and Kellie Bates, for injunctive relief and damages for procurement of breach of contract by defendant, Kameron Bates, and for breach of the contracts of noncompetition by the other defendants, former employees of the plaintiff. The complaint alleges that each of the former employee defendants entered into a "Tax Return Preparer's Employment Agreement" with the plaintiff.  The agreements were in effect from January

6, 1997 and ended at midnight on April 15, 1997.  The agreements contained noncompetition and antisolicitation covenants as follows:

> Noncompetition Covenant.  Employee covenants that during the two-year period following termination of this Agreement (such period to be extended by any period(s) of violation), he or she will not, in the city of employment hereunder or within twenty-five (25) miles from the corporate limits of such city, prepare an income tax return or file a return electronically for any of the Company's customers (that is, persons whose last filed state or federal income tax returns were prepared by the Company or by Employee in breach of this Agreement).

> Antisolicitation Covenant.  Employee covenants that during the two-year period following termination of this Agreement (such period to be extended by any period(s) of violation), he or she will not solicit, divert or take away, directly or indirectly, any of the Company's customers or clients, including, without limitation, those who were serviced by Employee or with whom Employee became acquainted by reason of access to or knowledge of information gained while employed by the Company.

The complaint further alleges that the agreements provided that if the defendants breached the above provisions, plaintiff would be paid all money and other considerations received by the former employees as a result of the breach and that such relief is not an exclusive remedy but is cumulative to other remedies available to the plaintiff "at law or in equity, including, but not limited to, recovery of actual damages and injunctive relief when appropriate."  The plaintiff alleges that in January of 1998 the former employee defendants commenced tax return preparation duties for the defendant, Kameron Bates, d/b/a Bates Income Tax Service, and in so doing performed tax return preparation duties for former clients of the plaintiff.  The complaint further avers that the former employee defendants transferred confidential information obtained from the plaintiff to defendant, Kameron Bates, in breach of their agreements, and that the breach of their agreements was in violation of Section 7216 of the Internal Revenue Code.  The complaint also alleges that the defendant, Kameron Bates, was aware of the contract existing between the plaintiff and the former employee defendants, and that he intentionally induced or procured the breach of the contracts between the plaintiff and the former employee defendants and that such action on the part of Kameron Bates was in violation of T.C.A. § 47-50-109, providing for treble damages.  The complaint seeks money damages against each of the former employee defendants and an injunction from violating the specific terms of the employment agreements.  The complaint also seeks a judgment against the defendant, Kameron Bates, d/b/a Bates Income Tax Service, for damages pursuant to the statute and an injunction to prevent his use of any information obtained by him from the former employees in violation of the employees' agreements with the plaintiff.

The defendants' answer admits the employment of the parties and their execution of the Tax Return Preparer's Employment Agreement and admits that, after defendants left the plaintiff's employment, they became employed by Kameron Bates, d/b/a Bates Income Tax Service. They deny that they violated the provisions of the contract as alleged and Kameron Bates denies that he had personal knowledge of the contracts between the plaintiff and the employee defendants. He also denies that he intended to induce or procure the breach of contract between those parties. Kameron Bates avers that the plaintiff and employee defendants had already severed their relationship and that, when he hired the employee defendants, there was no contract between the plaintiff and the employee defendants. The answer, as affirmative defenses, alleges that the covenant not to compete and the antisolicitation agreement, which were contained in the contracts, are unenforceable and void as against public policy. The defendants further aver that said agreements are unreasonable, capricious, and arbitrary.

A nonjury trial was held on two days, February 27, 2001 and March 20, 2001. The parties stipulated that the employee defendants executed the employment contracts containing the above-quoted clauses and that they all were in the employ of plaintiff before starting work for Kameron Bates.

Plaintiff's first witness, Patricia Cooper, testified that she is the district manager for plaintiff's Cookeville district and has been with the company for ten years. She testified generally concerning the training afforded to the tax preparers employed by plaintiff and the ability of the employees to obtain further education at discount rates. She explained the confidential nature of the business and testified that the tax preparers, such as the defendant employees in this case, have a personal relationship with their clients and that on average 85% to 95% of the tax preparers' business is return clients because of the personal face-to-face relationship the preparer has with the client. She testified that there were about 575 or 576 less returns in 1998 than were prepared in 1997. The average charge for tax preparation was $54.95. Concerning the repeat percentage of the business, she testified that, in 1997, the repeat percentage was 93.9% and, in 1998, it was 64.5%. She further testified that she was not able to calculate damages with specificity against each individual defendant, because there was no way to identify which individual prepared the return based on the documents received in discovery. Ms. Cooper further testified that the standards in the industry called for the preparer of the return to manually sign the return. She testified that there were no other major competitors in the Livingston area here in question and that she knew of no other factor other than the opening of Bates' tax service that would account for the 17.5% loss in clients.

On cross-examination, Ms. Cooper testified that they expected about a 20% nonreturn of clients, but her calculations of 17.5% was after adding the new clients that were received in the year in question. She denied that there could be a loss caused by client dissatisfaction with the new employees hired to replace the employee defendants. She was also questioned about a CPA opening an office during the year in question and the effect that it had on H & R Block's business. She admitted that she had made no independent inquiry to determine how many tax returns the CPA had prepared that year, nor had she inquired as to other individuals that had started preparing income tax returns for various clients. The only direct knowledge that she had of H & R Block clients solicited

by any of the employee defendants was Pat Bates' solicitation of a former client of H & R Block, Michael Pippin. She had no other direct knowledge of direct solicitation by any of the other defendants.

The next witness called by plaintiff was the defendant, Kameron Bates. Mr. Bates testified that he had formerly been employed by H & R Block doing various jobs, including setting up a computer system. He also worked as a tax preparer and signed a noncompetition and nonsolicitation agreement in his employment contract. He testified that he decided in the fall of 1997 to start his tax preparation business and that he started the business as a sole proprietorship. He stated that he probably talked with his wife about starting the business, but he did not recall any details about conversation. He related the various employees that he has had in the pertinent time period and testified that at the time he hired defendants, Perkins, Bates, Dunn, and Beatty, he did not have any idea that they had signed a noncompetition and antisolicitation agreement with H & R Block. He stated that his wife never told him that she had received a letter from H & R Block concerning her obligation under the contract, nor did he have any knowledge that the other employees had received such a letter. He also testified that he had forgotten that he had signed a noncompetition agreement in 1993 and 1994 when he was working for H & R Block. He testified that he never questioned their new clients as to whether they had been former clients of H & R Block. He also testified that he did not question clients, nor did he instruct the employees to question the clients concerning any former association with H & R Block. He further testified that, when he opened his business, he sent out flyers to prospective clients, taking the names from the telephone directory. Mr. Bates further testified that Bates Tax Service did prepare returns for H & R Block former clients.

The next witness to testify was Peggy Schwarz, Assistant Regional Director for H & R Block from Charlotte, North Carolina. The area involved in this lawsuit is included in her district and she has been with H & R Block for 26 years. She testified she was furnished the statistics for the H & R Block office and, using previous history of growth, she was able to reach a calculation of damages using Exhibits 3 and 4. We quote from the record:

> Q. By Mr. Durham: Ms. Schwarz, could you tell us what you have estimated the damages to be based upon the information that you gleaned from the Exhibits 3 and 4?
>
> A. Sure. The information that I had available indicated that the office had in fact been growing in clients served each year. Where in tax season 1998, we had a decrease of 17.5 percent, which equated to five hundred and sixty-seven less tax returns, less clients, than we had served the previous year. And I did not have information available which identified the actual clients that Bates Tax Service had used. There was no reason to think that the office wouldn't have continued to grow. So I just took that net decrease in clients served to calculate these losses.

Q. Did you consider new clientele at all in your assessment?

A. Well, actually, there would have been growth. But I didn't build that into these calculations. I just – had we had a flat year in 1998, this would have represented the loss, okay? So there was five hundred and sixty-seven less clients served. And using those numbers, I calculated what the revenue would have been using the same average fee for the returns that we did and applying that to the returns that we didn't do. And then from that gross revenue – well, and I also added in the fees that we charge for electronic filing returns. That's a separate fee that we track separately.

And then we pay a commission to our employees for the revenues that are collected. We pay an average of twenty-five percent tax prepares for preparing the return. So I reduced the revenue for tax preparation by this twenty-five percent commission, and we paid fifteen percent commission on returns that are, the fees that are collected for electronically transmitting. So I reduced the amount by that.

So I came up with a net amount for 1998, for example, of $27,545.99. I did those same calculations for '99 and 2000. We don't have the 2001 results yet. So that's not been added in. So the cumulative damages are –

*           *           *           *

Q. By Mr. Durham: So could you tell us what your estimated total -

A. The total for those three years, '98, '99, and 2000 is $90,575.98.

Q. Now, did you take into consideration fixed costs?

A. Well, the other operating expenses, the rent, utilities, phones, things of that nature would have remained constant. We haven't changed locations or anything like that. So those costs didn't decrease, even though we served less clients.

Ms. Schwarz also testified regarding calculations made using 332 matching clients, rather than 567, which she had used in her estimate, and reached calculations for damages for years 1998 through 2000 of $53,035.67. She stated that it was the same method of calculations, but the number of clients was different. On cross-examination, she was questioned concerning the training of tax preparers that was utilized by H & R Block. She testified that the training sessions are open to the

-5-

public and that individuals who take the training can go into business anywhere they please and that this would have an effect on the estimated damages. She also testified that she was not familiar with the number of other entities that started doing tax preparation in the years involved but that certainly that would also have an effect on her calculation of damages. She admitted that, without information concerning how many clients went from H & R Block to Bates Tax Service, she was not able testify concerning the actual damages incurred by H & R Block. She admitted that it would be speculation as to what part of the 567 estimated lost clients went to Bates Tax Service.

The plaintiff recalled Patricia Cooper and she testified concerning her calculation of damages. She stated that she took a list of Bates Tax Service clients and compared names from H & R Block files and determined that 332 former H & R Block clients were serviced by Bates. On cross-examination, she admitted that she could not tell what year Bates performed the service for the H & R Block clients, whether it was in 1997, 1998, or 1999, or a combination of the three years. She admitted that her calculations were based on the assumption that all 332 returns were done in 1998, 1999, and 2000, and that she did not know what time period the list covered. In essence, her testimony is that, of 332 returns that were prepared in a period of time stated, she cannot say that they were done each year, although her projection of damages is based on them having been done each year. Ms. Cooper also admitted that she did not put into her calculation the estimate 20% loss of clients each year which had earlier been established.

Michael Pippin was next called as a witness. Mr. Pippin testified that he is a resident of Cookeville, Tennessee, and that he owned a business as a truck driver. Prior to 1998, Pat Bates with H & R Block did his tax return starting in 1996. Ms. Bates recognized him as a client and, in 1998, he went to Bates' office where his return was prepared by Ms. Bates. On cross-examination, he testified that he received a flyer addressed to him from Bates Tax Service, stating that Ms. Bates was in business for herself or in business for Bates Income Tax Service. He does not remember the contents of the flyer, nor when it was received. He conceded that he really does not remember who sent the flyer to him.

Plaintiff next called Linda Tower as a witness. She testified that she worked for H & R Block for 13 years as a tax preparer, and that she is acquainted with Ms. Bates and Ms. Perkins. She recalled a conversation she had with Pat Bates concerning Ms. Bates' contemplation of establishing another business connection with a tax preparation firm in South Carolina but which did not work out for Ms. Bates. She also testified that she was offered an opportunity to go into business with Ms. Bates, but she declined. She was questioned concerning lost files in the H & R Block office in Livingston after she did a hard count of the files. The exact count was around 2,960, but she could not explain why the total number of files of 3,235 were not in the office. Ms. Tower further testified that she had seen former H & R Block clients walk into the Bates Income Tax Service office, but she did not know who performed the services for these clients. On cross-examination, she stated that she did not hear the clients complain about not receiving a discount, saying that they would not be back to H & R Block.

The next witness for plaintiff was Diane Hankes. Ms. Hankes testified that she is the district manager of the Nashville office of H & R Block and was formerly at the Cookeville office as a tax preparer. She left the Cookeville office about the middle of 1998. She is acquainted with the defendant employees, Bates, Perkins, et al. She testified that she was present in the Cookeville office when the recount of the Livingston files was done by Pat Bates and others from that office. The files were transferred back to Livingston after the count was done, but another count was done at the request of Pat Bates and Janie Perkins. Some time after the count was done, she had occasion to visit the Livingston office and found it in great disarray, with files piled on desks and on the floor in bags. The count was being made for the purpose of ascertaining the amounts of bonuses. She testified that the second count done in Livingston was higher than the first count, resulting in higher bonuses for Pat Bates and Janie Perkins.

Plaintiff next called defendant Janie Perkins. Ms. Perkins testified that she is a tax preparer with Bates Tax Service and also is Ms. Bates' sister. Prior to working for Bates Tax Service, she was employed with H & R Block for several years and has worked for Bates since 1998. She states that she made an effort to comply with the noncompete agreement but admits that she did not ask any of the clients that came into the office if they were former H & R Block clients.

Plaintiff next called Lisa Jo Dunn and she testified that she has been with Bates Tax Service since 1998 as a tax preparer, and that prior to that time she worked at H & R Block. She admits the noncompetition clause was in her contract with H & R Block. She states that she made no effort to comply with the noncompete, because she did not ask clients if they had previously used H & R Block for their tax preparation.

Plaintiff next called Kellie Beatty [Bates] as a witness. She states that had a noncompete agreement with H & R Block when she started working for Bates Tax Service, and that she made no effort to comply with the noncompete agreement.

Defendant Patricia Bates next testified that she had worked for H & R Block for approximately ten years. During that time, she was both a tax preparer and an office manager for several years. She has worked in the Livingston and Cookeville offices. After she went with Bates, she did not question clients as to whether they had previously been clients of H & R Block. She admitted that she had done nothing to comply with the competition agreement. Ms. Bates testified that, after she went with Bates, she did returns for friends and relatives, and that some of them had been H & R Block customers prior to that year.

The defendants called Patricia Bates as their first witness. She testified that she was a supervisor and tax preparer with H & R Block when she signed the contract with the noncompete clause. She stated that she received a bonus for being the supervisor. She further testified that, because of a nepotism policy, she was told that she could stay on as supervisor but that anyone related to her would have to go to a different office, or she could step down as supervisor and stay in the office. If she stepped down as supervisor, she would make less money and that, if she took the other option, she would lose one of her best employees and be left with a lot more duties. She

testified that she thought the policy was not fair or reasonable and that she decided to write a letter of resignation. She states she was not given an option to work somewhere else as an office supervisor. On cross-examination, Ms. Bates testified that she could not say with certainty that she would make less as a preparer than she would as an office supervisor. She admitted that she was offered the option of continuing as the office supervisor.

In rebuttal, plaintiff called Patricia Cooper. She testified that, when she became district supervisor for the area in question in 1997, she decided to enforce the H & R Block policy regarding nepotism. She related her reasons for doing so and started enforcing the policy district-wide, which included the employees in Crossville, Sparta, Cookeville, and Livingston. She stated her policy was not arbitrary and, regarding Pat Bates, Ms. Bates was told that she could keep the position in Livingston as supervisor. She admitted that the contract containing the noncompetition clause was signed prior to the decision to enforce the policy.

The court entered its final decree on May 23, 2001 which provides:

> This cause came on to be heard on February 20, 2001, and again on March 20, 2001, upon the plaintiff's complaint, the defendants' answer, upon oral and documentary evidence and upon the entire record. Upon consideration of all the foregoing including argument of counsel, the Court finds and hereby ORDERS, ADJUDGES AND DECREES as follows:
>
> 1. That at the conclusion of the plaintiff's proof, the facts and the law showed that the plaintiff had no right to relief as to the defendants Janie Perkins, Kellie Bates, and Lisa Jo Dunn and said defendants' T.R.C.P. Rule 41.02 motion was and is hereby sustained and this cause of action is dismissed as to those defendants.
>
> 2. That the plaintiff has failed to show by a preponderance of the evidence that it is entitled to injunctive relief, damages or to any relief against the defendants Kameron Bates and Patricia Bates and that the complaint should be and the same is hereby dismissed.
>
> 3. That the costs of this cause be assessed to the plaintiff for which execution may issue if necessary.

Plaintiff has appealed and presents five issues for review as stated in its brief:

> A. Did the Overton County Chancery Court err in refusing to presume a breach of contract based on violations of federal law and spoliation of evidence;

B. Did the Overton County Chancery Court err in holding that the Agreements were unenforceable;

C. Did the Overton County Chancery Court err in holding that Defendants Pat Bates, Janie Perkins, Kellie Bates, and Lisa Jo Dunn had not violated the terms of the Agreements;

D. Did the Overton County Chancery Court err in refusing to find that Defendant Kameron Bates d/b/a Bates Income Tax Service was liable for procurement of breach of contract; and

E. Did the Overton County Chancery Court err in holding in the alternative that if the terms of the Agreements were enforceable then the only relief to which H&R Block would be entitled was an injunction.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d). The trial court's rulings on questions of law are reviewed *de novo* with no presumption of correctness. ***See Campbell v. Florida Steel Corp.***, 19 S.W.2d 26, 35 (Tenn. 1996).

1. Whether the Overton County Chancery Court erred in refusing to presume a breach of contract based on violations of federal law and spoliation of evidence?

Plaintiff asserts that it is entitled to an adverse inference of breach of contract because of the defendants' failure to produce records and discovery relating to the persons for whom defendants performed tax preparation services. Defendants contended no such records ever existed and the plaintiff argues that the defendants' failure to comply with the relevant tax regulations regarding the signing of tax returns by the preparer would be the cause of there being no such records, if, in fact, they did not exist. Plaintiff argues that the defendants had an obligation to retain the records, and to produce the records pursuant to discovery, and that they failed to do so.

During the course of the trial, there was a great deal of dispute and colloquy among counsel and the court concerning the defendants' response to discovery requests. Defendants asserted throughout the proceedings that they had furnished everything required of them that they were able to furnish. On the other hand, plaintiff contends that they did not furnish such records and further that the failure to have the individual tax preparers sign the tax returns of their clients is a violation of the federal regulations and, in effect, a spoliation of evidence. As to the signing of the tax returns, defendant, Kameron Bates, testified that his business is a sole proprietorship and that all tax preparers are his employees. Under those circumstances, he contends that he is responsible for the accuracy of the return and, therefore, is the person required to sign the return. The federal

-9-

regulations entered into evidence seem to corroborate that opinion, but we do not find it necessary to prolong this opinion by delving into the interpretation of federal tax regulations.

There is no indication in the record that the plaintiff undertook to take any discovery depositions from any one or more of the defendants. The only indication in the record concerning discovery efforts on the part of the plaintiff is plaintiff's motion to compel defendant, Kameron Bates, "to fully and completely respond to plaintiff's interrogatories and request for production of documents propounded to defendants on or about July 31, 1998." There is no indication in the record as to what information was requested in these interrogatories nor the answers made thereto by defendant, Kameron Bates. The record also reflects no order ruling on the motion. Under the state of this record, this Court has no way of knowing what was requested and what was answered. It is abundantly clear that the plaintiff chose to go to trial in this case without pursuing an order compelling discovery. If, in fact, the defendant's answers to the interrogatories were evasive or nonresponsive, and if, in fact, he failed to produce documents in response to plaintiff's motions, these matters should have been determined by the court on plaintiff's motion pursuant to Tenn.R.Civ.P. 37.

This issue is without merit.

> 2. Whether the Overton County Chancery Court erred in holding that the agreements were unenforceable?

At the conclusion of the evidence, the trial court stated some findings from the bench and, in regard to the provisions of the employment contracts, stated:

> THE COURT: Well, the Court holds and finds that the part of the covenant of the anti-competition agreement that prohibits just the mere preparation of taxes is unreasonable and puts an undue burden upon the Defendants in this case. And it's therefore unenforceable.
>
> And I find and believe that that part of it that would prohibit solicitation would be enforceable. However, there's not – in the Court's opinion, the Court finds that there's not any proof by a preponderance of the evidence that Patricia Bates has solicited any of these clients. So it resolves that, the Court finds that the Plaintiffs' complaint should be dismissed, [at] the Plaintiffs' cost.

Agreements in restraint of trade, such as covenants restricting competition are not invalid per se. Although disfavored by law, such agreements are valid and will be enforced provided they are deemed reasonable under the particular circumstances. *See Heyer-Jordan, Inc. & Assoc. v. Jordan*, 801 S.W.2d 814 (Tenn. Ct. App. 1990)(citing *Allright Auto Parts, Inc. v. Berry*, 219 Tenn. 280, 409 S.W.2d 361, 363 (1966)).

In *Allright, supra*, our Supreme Court said:

> Agreements in restraint of trade, such as covenants restricting competition, are not invalid per se. Although disfavored by law, such agreements are valid and will be enforced, provided they are deemed reasonable under the particular circumstances.

*Id.* (citations omitted).

In *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 271 (Tenn. 1984), the Court stated:

> Although the numerous cases addressing the issue of the interests entitled to protection are not entirely reconcilable to each other, nevertheless certain interests have emerged as being entitled to the protection of a non-competition covenant. *See generally*, Annot., 43 A.L.R.2d 94 (1955). Such legitimate business interests include trade or business secrets or other confidential information. *See, e.g., Matthews v. Barnes, supra; All Stainless, Inc. v Colby, supra*. Restrict covenants have been held reasonable were the employee closely associates or has repeated contact with the employer's customers so that the customer tends to associate the employer's business with the employee. *See, e.g., Matthews v. Barnes, supra; Hospital Consultants, Inc. v. Potyka*, 531 S.W.2d 657, 661 (Tex.App.1975). Covenants have also been held reasonable in order to prevent misuse of customer lists. *See, e.g., E.L. Conwell and Company v. Gutberlet*, 429 F.2d 527, 528 (4th Cir. 1970).

671 S.W.2d at 473.

In the instant case, plaintiff's theory appears to be that the defendant employees had such a relationship with the client that the customer could tend to associate H & R Block's business with that particular employee. Plaintiff's district manager testified that the tax preparers have a personal relationship with their clients and that eighty-five percent to ninety-five percent of the tax preparer's business is from return clients. However, plaintiff presented no proof from any of H & R Block's clients concerning the nature and extent of the relationship between the tax preparer and the client. To the contrary, the record suggests that plaintiff's business is promoted by its reputation and exposure through advertising without any reference to the individual employees. The employee contracts were for very short duration, which in itself detracts from the assertion that the client seeks an individual preparer. Considering the nature of the business, the proof does not support a theory that the customer tends to associate H & R Block's business with a particular employee.

Plaintiff also asserts that it provides specialized training now being used by the defendants to plaintiff's disadvantage. The record reflects that plaintiff's employees were given, at a discounted

fee, a general tax course offered to the public at large. The expertise of the tax preparer is controlled by federal law and applies equally to all persons preparing tax returns. It appears that the expense incurred by plaintiff for the training is minimal since they do make a charge to the individual employees for such training. There is no confidential information furnished to the tax preparer by H & R Block.

We also note that the prohibition in the noncompetition clause is aimed at prior H & R Block clients, without regard to the place where the services to the clients were performed. The restriction is not confined to the previous contacts of the individual preparers with the clients and is overbroad. Considering all of the facts in the light of the record before us, we concur with the chancellor's finding that the noncompetition agreement is unreasonable and therefore unenforceable.

We also agree with the chancellor's finding that the nonsoliciation agreement is reasonable. The evidence does not preponderate against the chancellor's finding that there was no breach of this provision by any of the defendant former employees.

The next issue for review is whether the trial court erred in holding that the defendants, Pat Bates, Janie Perkins, Kellie Bates, and Lisa Jo Dunn, had not violated the terms of the agreements.

The only proof in the record that any of the former employees prepared a tax return for an H & R Block previous-year-client was from Michael Pippin, who testified that Pat Bates prepared his return for 1998. There is absolutely no proof that the other former employees prepared a return for a former H & R Block client. However, since the noncompetition agreement is unenforceable as to the individual employees, we need not consider that part of the agreement. As to the nonsolicitation clause of the contract, the only testimony of any solicitation came from Michael Pippin, and he finally conceded in his testimony that he did not remember from whom any solicitation came nor the contents thereof as to whether it was, in fact, a solicitation. The weight, faith, and credit to the be given to this witness' testimony lies in the first instance with the trial court as the trier of fact and the credibility accorded by the court will be given great weight by this Court. *Town of Alamo v. Forcum-James Co.*, 205 Tenn. 478, 327 S.W.2d 47 (1959); *Haverlah v. Memphis Aviation, Inc.*, 674 S.W.2d 297, 302 (Tenn. Ct. App. 1984). The trial court determined that, based upon the proof of this witness' testimony, there had been no violation of the nonsolicitation agreement, and that the evidence does not preponderate against the trial court's finding in this regard.

The next issue for review is whether the Overton County Chancery Court erred in refusing to find that defendant, Kameron Bates, d/b/a Bates Income Tax Service, was liable for procurement of breach of contract.

Plaintiff alleges in its complaint that defendant, Kameron Bates, d/b/a Bates Income Tax Service violated T.C.A. § 47-50-109 which provides:

**Procurement of breach of contracts unlawful - Damages. -** It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of contract. the party injured by such breach may bring suit for the breach and for such damages.

In *Emmco Ins. Co. v. Beacon Mut. Indemn. Co.*, 204 Tenn. 540, 322 S.W.2d 226 (1959), our Supreme Court said:

> The Code Section relied on (47-1706, T.C.A.) and made the basis of this action under the Second Count of the declaration contemplates the improper inducement, and we might add the unlawful conduct, of the alleged wrongdoer whereby a contract is broken. The statute contemplates the imposition of a severe penalty, "and should not be enforced except upon a clear showing." *Lichter v. Fulcher*, 22 Tenn.App. 670, 125 S.W.2d 501, 508.

*Id.* at 230-31.

In *Myers v. Pickering Firm*, 959 S.W.2d 152 (Tenn. Ct. App. 1997), the elements of a cause of action for procurement of a breach of contract are set out:

> The elements of a cause of action for procurement of the breach of a contract are: 1) there must be a legal contract; 2) the wrongdoer must have knowledge of the existence of the contract; 3) there must be an intention to induce its breach; 4) the wrongdoer must have acted maliciously; 5) there must be a breach of the contract; 6) the act complained of must be the proximate cause of the breach of the contract; and, 7) there must have been damages resulting from the breach of the contract.

*Id.* at 158.

In the instant case, the employment contracts concerning competition by the former employees have been held unenforceable. Therefore, no breach of contract exists. Since there was no breach of contract, plaintiff cannot establish that necessary element under the statute. *See Smith v. Harriman Util. Bd.*, 26 S.W.3d 879 (Tenn. Ct. App. 2000). Accordingly, the trial court did not err in failing to find Kameron Bates liable for procurement or inducement of a breach of contract.

The last issue for review is pretermitted.

The decree of the trial court is affirmed and this case is remanded to the trial court for such further proceedings as may be necessary. Costs of the appeal are assessed against the appellant, H & R Block Eastern Tax Services, Inc., and its surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.